UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
LATEEF KASSIM,

                      Plaintiff,

           - against -

CVS ALBANY, LLC and CVS PHARMACY
INC.,

                  Defendants.
--------------------------------------------------------x

**MEMORANDUM & ORDER**
21-CV-2927 (PKC) (TAM)

PAMELA K. CHEN, United States District Judge:

Plaintiff Lateef Kassim brings this employment discrimination and retaliation action against Defendants CVS Albany, LLC, and CVS Pharmacy Inc., claiming he was denied a promotion on the basis of race and then terminated on February 27, 2021, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.; New York State Human Rights Law, New York State Executive Law §§ 296 and 296(7); and New York City Human Rights Law, New York City Administrative Code §§ 8-107, 8-107(8), and 8-107(13).  Currently pending before the Court is Defendants' motion to dismiss the complaint or stay this action and to compel arbitration. (Defendants' Notice of Motion to Dismiss and to Compel Arbitration, Dkt. 16.)  For the reasons stated below, the Court grants Defendants' motion to compel arbitration, and stays this case pending arbitration.

# BACKGROUND

I.     **Factual Background**[1]

A.     **The Arbitration Agreement Between Plaintiff and CVS**

Plaintiff began working for CVS Pharmacy ("CVS") in the late 1990s.  (*See* Declaration of Stephanie Garrett ("Garrett Decl."), Ex. 4 ("Employee Profile"), Dkt. 16-3, at ECF[2] 28.)  He started "as a crew Assistant" and became a "Senior Crew Coordinator" by May 2014, which is a position within the Setup Department.  (Complaint ("Compl."), Dkt. 1, ¶ 38; Employee Profile, Dkt. 16-3, at ECF 28.)

In October 2014, CVS introduced an arbitration policy under which an employee and CVS "each waive the right to pursue employment-related claims in court, agreeing instead to submit such disputes to binding arbitration."  (Declaration of Robert Bailey ("Bailey Decl."), Dkt. 16-2,

---

[1] With respect to the factual background, the Court relies both on the allegations in Plaintiff's complaint and information provided by Defendants in their motion papers or attached exhibits and declarations that Plaintiff does not appear to contest.  While the Court ordinarily would be limited to considering only the non-conclusory allegations in the complaint when ruling on Defendants' motion to dismiss, *see Friedl v. City of New York*, 210 F.3d 79, 83–84 (2d Cir. 2000), because Defendants also seek to compel arbitration, the Court may consider undisputed facts proffered by the parties, *see Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (explaining that when deciding motions to compel arbitration, courts apply a "standard similar to that applicable for a motion for summary judgment" and if "the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law," the court "may rule on the basis of that legal issue and avoid the need for further court proceedings") (quoting *Bensadoun v. Jobe–Riat*, 316 F.3d 171, 175 (2d Cir. 2003) and *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 172 (2d Cir. 2011) (internal quotation omitted)).  Accordingly, where Defendants have provided in their motion papers or attached exhibits and declarations any relevant factual information that Plaintiff does not provide and/or does not seem to contest, the Court has relied on those documents and information. In particular, where Plaintiff's complaint fails to provide specific dates with respect to his employment history, the Court has relied on documents and information supplied by Defendants.

[2] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system, not the document's internal pagination.

¶ 6; *see also* Bailey Decl., Ex. A ("Arbitration Policy"), Dkt. 16-2, at ECF 8–11.) The Arbitration

Policy sets forth the parties' mutual obligation to arbitrate as follows:

> **1. Mutual Obligation to Arbitrate.** Under this Policy, CVS Health (including its subsidiaries) and its Employees agree that any dispute between an Employee and CVS Health that is covered by this Policy ("Covered Claims") will be decided by a single arbitrator through final and binding arbitration only and will not be decided by a court or jury or any other forum, except as otherwise provided in this Policy. This Policy is an agreement to arbitrate disputes covered by the Federal Arbitration Act (9 U.S.C. §§ 1-16). Employees accept this Policy by continuing their employment after becoming aware of the Policy.

(*See* Arbitration Policy, Dkt. 16-2, at ECF 8.) The Arbitration Policy also delineates which claims

are—and are not—covered:

> **2. Claims Covered by this Policy.** Except as otherwise stated in this Policy, Covered Claims are any and all legal claims, disputes or controversies that CVS Health may have, now or in the future, against an Employee or that an Employee may have, now or in the future, against CVS Health, its parents, subsidiaries, successors or affiliates, or one of its employees or agents, arising out of or related to the Employee's employment with CVS Health or the termination of the Employee's employment.
>
> Covered Claims include but are not limited to disputes regarding . . . leaves of absence, harassment, discrimination, retaliation and termination arising under the Civil Rights Act of 1964, Americans with Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act . . . and other federal, state and local statutes, regulations and other legal authorities relating to employment.
>
> Covered claims also include disputes arising out of or relating to the validity, enforceability or breach of this Policy, except as provided in the section below regarding the Class Action Waiver.
>
> **3. Claims NOT Covered by This Policy.** This Policy does not apply to claims by an Employee for workers compensation, state disability insurance, unemployment insurance benefits or claims for benefits under an employee benefit plan. This Policy does not prevent or excuse an Employee (either individually or together with others) or CVS Health from using the company's existing internal procedures for resolution of complaints, and this Policy is not intended to be a substitute for the use of such procedures.
>
> This Policy applies only to legal claims. Thus, it would not apply to a claim by an Employee that CVS Health acted improperly or unfairly or inconsistently, if the company's alleged actions did not also violate the Employee's rights under a particular law.

3

This Policy does not apply to claims raised in litigation pending as of the date an Employee first receives or views this Policy.

This Policy does not prohibit an Employee or CVS Health from filing: a motion in court to compel arbitration; a motion in court for temporary or preliminary injunctive relief in connection with an arbitrable controversy; or an administrative charge or complaint with any federal, state or local office or agency, including but not limited to the U.S. Department of Labor, Equal Employment Opportunity Commission or National Labor Relations Board.  Also excluded from this Policy are disputes that may not be subject to a pre-dispute arbitration agreement as provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act or any other binding federal law or legal authority.

(*See* Arbitration Policy, Dkt. 16-2, at ECF 8–9.)  The Arbitration Policy further provides in Section 4, which is entitled, "Arbitration Proceedings":

**c. Rules and Procedures.**  The arbitration will be administered by the American Arbitration Association ("AAA") and will be conducted in accordance with the Employment Arbitration Rules and Mediation Procedures of the AAA ("AAA Rules") then in effect.

(*See id.*, at ECF 10.)

The same month that CVS introduced the Arbitration Policy, Defendants invited employees to "participate in a LearNet training course, *Arbitration of Workplace Legal Disputes* (Course No. 800305) ('Arbitration Training Course'), which . . . educates CVS's [employees] on its Arbitration Policy."  (Bailey Decl., Dkt. 16-2, ¶ 8.)  LearNet is the learning management system that CVS uses to administer its training courses.  (*Id.* ¶ 5.)  "Each CVS employee has a unique log-in credential and personalized password enabling access to various LearNet courses."  (*Id.*)

The online Arbitration Training Course is comprised of six sequential web pages, which Defendants refer to as "slides."  (*See* Bailey Decl., Ex. B ("Arbitration Training Course Slides"), Dkt. 16-2, at ECF 13–32.)  "The third slide of the Arbitration Training Course contains a link to the *CVS Health Colleague Guide to Arbitration*" ("Arbitration Policy Guide"), which contains the Arbitration Policy in full.  (Bailey Decl., Dkt. 16-2, ¶ 9.)  When viewing the Arbitration Training Course, employees are unable to continue past the third slide without clicking the link to display

4

the Arbitration Policy Guide.  (*Id.* ¶ 10.)  The Arbitration Policy Guide also "educates [employees] on their rights as they relate to arbitration, the manner in which a[n] [employee] accepts the terms of the Arbitration Policy, and how to opt out of the Arbitration Policy."  (*Id.*)  Specifically, the Arbitration Policy Guide that employees must review as part of the Arbitration Training Course explains that CVS employees may opt out of the Arbitration Policy:

**Colleagues' Rights**

The arbitration policy is not meant to discourage or prevent colleagues from filing a complaint with or participating in an investigation by any federal, state or local office or agency, including but not limited to the U.S. Department of Labor, Equal Employment Opportunity Commission or National Labor Relations Board. (Indeed, to bring certain legal claims, a colleague must file a complaint with one of these agencies first. The arbitration policy does not affect that obligation.)  CVS Health recognizes and respects colleagues' rights to engage with these public authorities, and, as always, we will not retaliate against any colleague who exercises these legal rights.

Arbitration is a matter of contract between the colleague and CVS Health. Colleagues accept the policy by continuing their employment with CVS Health after becoming aware of the policy.  With that being said, we want colleagues' participation to be voluntary.  Colleagues will be asked to acknowledge and agree to the policy, but from the time that a colleague first views or receives the policy, he or she has thirty days to opt out of the policy.  If a colleague opts out, he or she will not be obligated to go to arbitration and can continue to use the traditional court system as before.  Likewise, if a colleague opts out, CVS Health will not be required to arbitrate any disputes it has with that colleague.

**How to Opt Out**

In order to opt out, a colleague must mail a written, signed and dated letter stating clearly that he or she wishes to opt out of the CVS Health Arbitration of Workplace Legal Disputes Policy.  The letter must be mailed to CVS Health, P.O. Box 969, Woonsocket, RI 02895.  In order to be effective, the colleague's opt out notice must be postmarked no later than 30 days after the date the colleague first views or receives the policy.  Please note, sending in a timely notice is the only way to opt out.  A colleague cannot opt out by refusing to complete training or attend meetings about the policy.

CVS Health will not tolerate retaliation against any colleague who decides to opt out.

(*Id.*)

5

In order to complete the Arbitration Training Course, CVS employees must return to the LearNet Arbitration Training Course slides after reviewing the Arbitration Policy Guide, starting with Slide Number 4.  (*Id.* ¶ 11.)  The fourth slide reads: "Now that you have read the training guide and policy, it is time to complete the acknowledgment.  **Click next to continue.**" (Arbitration Training Course Slides, Dkt. 16-2, at ECF 29.)  The fifth slide of the Arbitration Training Course instructs the user to "click the 'Yes' button at the bottom of the slide to confirm acknowledgement of, and agreement to, the statements on that slide."  (Bailey Decl., Dkt. 16-2, ¶ 12; *see also* Arbitration Training Course Slides, Dkt. 16-2, at ECF 30–31.)  An employee cannot complete the Arbitration Training Course without clicking on that button.  (Bailey Decl., Dkt. 16-2, ¶ 12.)  By clicking "Yes" on the fifth slide, the employee is acknowledging and agreeing to the following, among other statements ("Arbitration Agreement"):

> that I have carefully read the CVS Health policy "Arbitration of Workplace Legal Disputes" (the "Policy") and understand that it applies to me;
>
> …
>
> that, to opt out, I must mail a written, signed and dated letter, stating clearly that I wish to opt out of this Policy to CVS Health, P.O. Box 969, Woonsocket, RI 02895, which must be postmarked no later than 30 days after the date I first received or viewed a copy of this Policy; [and]
>
> that by being covered by the Policy and not opting out, CVS Health and I are obligated to go to arbitration instead of a court to resolve legal claims covered by the Policy.

(*Id.* ¶ 13.)

Every CVS employee at the time the Arbitration Policy was introduced, in October 2014, was "notified to complete the Arbitration Training Course through LearNet and by his or her Store Manager."  (*Id.* ¶ 14.)  Employees were able to print the Arbitration Policy Guide and the Arbitration Policy at no cost using CVS-owned equipment.  (*Id.* ¶ 15.)  According to records maintained in LearNet, Plaintiff "completed his training on the Arbitration Policy on January 4,

2015," and entered into the Arbitration Agreement that day by "click[ing] 'Yes' on the fifth slide of the training" module.  (*Id.* ¶ 16; *see also* Bailey Decl., Ex. D, Dkt. 16-2, at ECF 44.) Furthermore, "CVS did not receive a timely notice from plaintiff indicating his desire to opt out of the Arbitration Policy." (Bailey Decl., Dkt. 16-2, ¶ 18.)

## II.    Plaintiff's Employment at CVS After Entering Into the Arbitration Agreement

In October 2014, Plaintiff was still employed as a Senior Crew Coordinator, as part of the Setup Department.  (*See* Employee Profile, Dkt. 16-3, at ECF 28.)  The Setup Department was scheduled to be eliminated in 2016 as part of a reduction in CVS's workforce as of December 31, 2016.  (Compl., Dkt. 1, ¶ 38; Garrett Decl., Dkt. 16-3, ¶ 4.)  Sometime around the end of 2016, CVS offered Plaintiff a position at Defendants' store located in Staten Island as an Operations Manager.  (Compl., Dkt. 1, ¶ 38.)  Plaintiff applied for the Operations Manager position on December 28, 2016, several days before he was terminated by CVS on December 31, 2016.[3] (Garrett Decl., Dkt. 16-3, ¶ 5.)

On January 9, 2017, Plaintiff received and accepted the offer for the Operations Manager position.  (*Id.*)  He began working in that role on January 15, 2017.  (*Id.* ¶¶ 5–7.)  Plaintiff worked in this position for the next four years.  (Compl., Dkt. 1, ¶ 39.)

---

[3] The parties disagree as to when Plaintiff was terminated from his original position with CVS, but this disagreement is immaterial to the present motion.  Plaintiff claims he was terminated in June of 2016 and began receiving severance pay as a result.  (Plaintiff's Affidavit ("Kassim Affidavit"), Dkt. 18-2, ¶ 5.)  However, Defendants point out that Plaintiff was notified of his impending termination in November 2016, and have produced records to demonstrate that the payments Plaintiff was receiving until November of 2016 were in the form of wages, not severance, which varied based on hours worked.  (Declaration of Tammy Kelly ("Kelly Decl."), Dkt. 17-1, ¶¶ 5–8.)  Nonetheless, whether the termination happened in June or December 2016 is immaterial to the Court's findings, as both timelines include a break in employment before Plaintiff was re-hired.

On January 28, 2021, Plaintiff received a phone call from Stephanie Garrett, a member of the Advice & Counsel team at CVS, during which she told Plaintiff that Defendants would promote Plaintiff to a store manager position.  (*Id*. ¶ 42.)  Plaintiff received no promotion before being terminated a second time by CVS on February 27, 2021.  (*Id*. ¶¶ 39, 44.)

## III.  Procedural History

Plaintiff filed his complaint on May 24, 2021, alleging retaliation and employment discrimination based on race "[f]rom 2017 until [his] termination" on February 27, 2021 (Compl., Dkt. 1 ¶¶ 39, 44), in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.; New York State Human Rights Law, New York State Executive Law §§ 296 and 296(7); and New York City Human Rights Law, New York City Administrative Code §§ 8-107, 8-107(8), and 8-107(13).  (*See* Compl., Dkt. 1, ¶¶ 39–47, 62, 64–65, 69, 71–72, 74–75, 77–78, 80–81.)  Before filing this lawsuit, Plaintiff filed a complaint with the EEOC on or about April 9, 2021.  (*Id*. ¶ 32.) He received a right to sue letter from the EEOC on or about May 10, 2021.  (*Id*. ¶ 33.)

On August 12, 2021, Defendants requested a pre-motion conference for an anticipated motion to dismiss, or to stay the action and compel arbitration.  (*See* Dkt. 10).  The Court denied that request for a conference as unnecessary and directed the parties to submit briefing on the motion.  (8/23/2021 Dkt. Order).  Defendants' motion was fully briefed on October 6, 2021.  (*See* Dkt. 15.)

## DISCUSSION

## I.  Legal Standard

The Federal Arbitration Act ("FAA") provides that a written arbitration agreement in "a contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  The FAA reflects a "national policy favoring arbitration."  *Nicosia*, 834 F.3d at 228–

29 (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011)).  "[D]espite the strong federal policy favoring arbitration, arbitration remains a creature of contract," and courts must therefore "decide whether the parties to a contract have agreed to arbitrate disputes."  *Starke v. Square Trade, Inc.*, 913 F. 3d 279, 288 (2d Cir. 2019) (citations omitted).  Accordingly, "the FAA 'does not require parties to arbitrate when they have not agreed to do so.'"  *Nicosia*, 834 F.3d at 229 (quoting *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012)); *see also Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 395 (2d Cir. 2015) ("[A] party cannot be required to submit to arbitration any dispute which [the party] has not agreed so to submit." (quoting *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 171 (2d Cir. 2004))).  Another consequence of the fact that arbitration is a matter of contract is that "parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether . . . [the parties' arbitration agreement] covers a particular controversy."  *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010).

When deciding motions to compel arbitration, courts apply a "standard similar to that applicable for a motion for summary judgment," which requires "consider[ing] all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits," and "draw[ing] all reasonable inferences in favor of the non-moving party."  *Nicosia*, 834 F.3d at 229 (quotations and citations omitted).  If "the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law," the court "may rule on the basis of that legal issue and avoid the need for further court proceedings."  *Id.* (internal quotation marks and citation omitted).

The moving party "has the initial burden of showing that an agreement to arbitrate exists." *Carvant Fin. LLC v. Autoguard Advantage Corp.*, 958 F. Supp. 2d 390, 395 (E.D.N.Y. 2013); *see*

*also Butto v. Collecto Inc.*, 802 F. Supp. 2d 443, 446 (E.D.N.Y. 2011) ("[T]he party seeking to compel arbitration has the burden of demonstrating by a preponderance of the evidence the existence of an agreement to arbitrate.") (quotation omitted).  Once that initial showing is made, "[t]he party resisting arbitration bears the burden of demonstrating that the arbitration agreement is invalid or does not encompass the claims at issue."  *Ferro v. Allied Interstate, LLC*, No. 19-CV-49 (ARR) (ST), 2019 WL 3021234, at *2 (E.D.N.Y. July 10, 2019) (alteration in original) (quoting *Shetiwy v. Midland Credit Mgmt.*, 959 F. Supp. 2d 469, 473 (S.D.N.Y. 2013)); *see also Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000) ("[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." (citations omitted)).

II.     **An Enforceable and Valid Arbitration Agreement Exists Between Plaintiff and CVS**

As a threshold matter, Plaintiff argues that he is not bound by the Arbitration Policy on which Defendants rely in moving to compel arbitration because the Arbitration Agreement that Plaintiff entered into on January 4, 2015 was not a validly created contract, and that even if it were a valid contract, his employment discrimination claims are not within the scope of the Arbitration Policy, which expired when Plaintiff was terminated from his position as a Senior Crew Coordinator in 2016.  (*See generally* Plaintiff's Opposition to Defendants' Motion to Compel Arbitration and Dismiss the Case ("Pl. Opp."), Dkt. 18.)  The Court considers first whether the Arbitration Agreement was validly formed, and then addresses whether Plaintiff's claims fall within the scope of that agreement.

A.     **The Court Decides Whether A Valid and Enforceable Agreement to Arbitrate Exists**

The preliminary inquiry of whether the Arbitration Agreement is valid and enforceable is a matter for the Court to decide.  As explained further *infra*, questions of arbitrability, that is "whether the parties are bound by a given arbitration clause" and "whether an arbitration clause in

a concededly binding contract applies to a particular type of controversy" can be delegated to the arbitrator if the parties clearly and unmistakably express their intent to do so.  *See Kai Peng v. Uber Techs., Inc.*, 237 F. Supp. 3d 36, 45 (E.D.N.Y. 2017) (quotations omitted).  However, the "more basic issue . . . of whether the parties agreed to arbitrate in the first place is one only a court can answer." *Id.* (quoting *VRG Linhas S.A. v. MatlinPatterson Glob. Opportunities Partners II L.P.*, 717 F.3d 322, 325 n.2 (2d Cir. 2013)).

## B.      New York Law Applies

Issues of contract formation are governed by the choice-of-law doctrine of the forum state, which in this case is New York.  *See Specht v. Netscape Commc'ns Corp.*, 150 F. Supp. 2d 585, 590 (S.D.N.Y. 2001) (explaining that the preliminary question of whether a contract has been formed is governed by state law, and looks to the choice-of-law doctrine of the forum state). "[W]hile . . . the FAA preempts state law that treats arbitration agreements differently from any other contracts, it also preserves general principles of state contract law as rules of decision on whether the parties have entered into an agreement to arbitrate." *Chelsea Square Textiles, Inc. v. Bombay Dyeing & Mfg. Co.*, 189 F.3d 289, 295–96 (2d Cir. 1999); *see also Schnabel*, 697 F.3d at 119 ("Whether or not the parties have agreed to arbitrate is a question of state contract law."). New York's choice-of-law rules direct courts to "evaluate[] the 'center of gravity' or 'grouping of contacts' with the purpose of establishing which state has the most significant relationship to the transaction and the parties." *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 394 (2d Cir. 2001) (quoting *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 618 N.Y.S.2d 609, 612 (N.Y. 1994)).

Here, Defendants appear to concede that New York law should apply to whether the Arbitration Agreement is enforceable, whereas Plaintiff is silent about which state's law should apply.  (*See* Defendants' Memorandum of Law in Support of Their Motion to Dismiss, or

Alternatively to Stay, and to Compel Arbitration ("Def. Mem."), Dkt. 16-1, at 9–10 (citing New York law about enforceability of contracts generally and arbitration agreements specifically); *see generally* Pl. Opp., Dkt. 18.)  The Court finds that New York law should apply because New York has the most significant contacts with the matter in dispute.  Plaintiff is a resident of New York, and for both relevant periods of his employment with Defendants, Plaintiff was located in New York.  (Compl., Dkt. 1, ¶ 38.)  The parties have not suggested that any other state has a single relevant contact to this case, let alone a "group of contacts."  Therefore, the Court finds that New York law governs the issue of whether an arbitration agreement exists between the parties.

### C.    The Arbitration Agreement is a Valid and Enforceable Contract

Defendants have met their burden in demonstrating that the Arbitration Agreement is a valid and enforceable agreement.  According to the records associated with Defendants' LearNet online platform, Plaintiff completed his training on the Arbitration Policy on January 4, 2015.  (Bailey Decl., Dkt. 16-2, ¶ 16.)  As part of this training module, Plaintiff was required to click on a link that would display the Arbitration Policy.  (*Id.* ¶¶ 9, 10.)  After opening this link, Plaintiff was required to click a "Yes" button on the fifth slide of the course, thereby "acknowledging and agreeing" that he had "carefully read" the Arbitration Policy and that he "underst[ood] that it applies" to him.  (*Id.* ¶ 13; *see also* Arbitration Training Course Slides, Dkt. 16-2, at ECF 30.)  The fifth slide also explained that by clicking the "Yes" button, Plaintiff was "acknowledging and agreeing" that he had a 30-day period to opt out of the Arbitration Policy, and that "by being covered by the Policy and not opting out," he was "obligated to go to arbitration instead of court to resolve legal claims covered by the Policy."  (Bailey Decl., Dkt. 16-2, ¶ 13; *see also* Arbitration Training Course Slides, Dkt. 16-2, at ECF 30.)  Finally, the fifth slide makes clear that Plaintiff's "click of the 'Yes' button create[d] an electronic signature that is legally binding."  (Arbitration

Training Course Slides, Dkt. 16-2, at ECF 30.)  Thus, by clicking "Yes" on the fifth slide, Plaintiff entered into a valid arbitration agreement with Defendants.

Plaintiff raises several arguments as to why the Arbitration Agreement was not a validly formed contract, but he conflates related arguments and fails to organize them in a coherent manner.  Properly construed, Plaintiff's four arguments against contract formation are: (1) because he was not provided a copy of the Arbitration Policy "for subsequent readings," he could not "utilize [his] options to revoke" his prior "forced consent" (Pl. Opp., Dkt. 18, at 8); (2) "he was unaware" that he consented to an arbitration agreement when he completed the Arbitration Policy Training (*id.* at 10); (3) the Arbitration Agreement lacks signatures, and so is invalid for failing to identify the parties to the contract (*id.*); and (4) Defendants used "new technology to ensure that [Plaintiff] would be unlikely to learn" of both the arbitration agreement and the opt-out option (*id.* at 9).  None of these arguments have merit.

As to the first argument, Plaintiff relies on a single state court case from California to support the notion that an arbitration agreement is unenforceable because the employer did not provide a copy of the agreement to its employees.  (Pl. Opp., Dkt. 18, at 8 (citing *Sparks v. Vista Del Mar Child & Family Servs.*, 145 Cal. Rptr. 3d 318 (Cal. Ct. App. 2012)), *abrogated on other grounds by Harris v. TAP Worldwide, LLC*, 203 Cal. Rptr. 3d 522 (Cal. Ct. App. 2016)).  However, "[d]ecisions of a state's intermediate and lower courts are not binding on the federal courts." *Philadelphia Indem. Ins. Co. v. Indian Harbor Ins. Co.*, 434 F. Supp. 3d 4, 10 (E.D.N.Y. 2020).  The decision in *Sparks* lacks even persuasive value, as it is an intermediate California state court decision interpreting California laws, which are irrelevant to this case.  In any event, the LearNet training program that Plaintiff completed provided him the ability to print a physical copy of the Arbitration Policy—at no cost to him.  (Bailey Decl., Dkt. 16-2, ¶ 15.)  Even if Plaintiff did not

13

print out a copy when he completed the training program, Plaintiff was able to "obtain copies of the [Arbitration] Policy from [his] supervisor, Human Resources or the CVS Health Policy & Procedure Portal," a fact that he acknowledged when completing the fifth slide of the training program.  (*See* Arbitration Training Course Slides, Dkt. 16-2, at ECF 31.)  Therefore, Plaintiff's argument that the Arbitration Policy is invalid because he did not receive a copy of the agreement simply has no merit in fact or law.

Second, Plaintiff claims in his affidavit that he was unaware he allegedly consented to arbitration.  Yet New York law allows courts to infer that a party acted knowingly when entering into an online agreement to arbitrate when the party "takes some action demonstrating that [he] has at least constructive knowledge of the terms of the agreements."  *Kai Peng*, 237 F. Supp. 3d at 47 (quoting *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 25 (2d Cir. 2010) (summary order)).  Here, Defendants have submitted an affidavit and business records indicating that Plaintiff clicked "Yes" on the fifth slide of the Arbitration Policy Training, and by doing so he "acknowledg[ed] and agree[d]" that had read, understood, and agreed to the Arbitration Policy, including his right to opt-out of the agreement within 30 days of the training.  (*See* Bailey Decl., Dkt 16-2, ¶¶ 13, 16.)  Plaintiff does not contest that he completed the training program or that he acknowledged and agreed to be bound by the Arbitration Policy on the fifth slide of the training program.  He only states that he "does not *recall* consenting to arbitration" and that he "was *unaware* that [he] had an option to opt-out" until he saw Defendants' motion to dismiss papers.[4]  (Kassim Affidavit, Dkt.

---

[4] The Court would be remiss if it did not note that Plaintiff's opposition papers are inconsistent with Plaintiff's affidavit.  Plaintiff's opposition mischaracterizes Plaintiff's affidavit as "indicating that he was unaware that he allegedly consented to arbitration."  (*See* Pl. Opp., Dkt. 18, at 10.)  However, in Paragraph 6 of his Affidavit, Plaintiff states that he was "unaware that [he] had an option to opt-out" of the arbitration agreement.  (Kassim Affidavit, Dkt. 18-2, ¶ 6.)  As Defendants point out in their reply memorandum, at most Plaintiff states in his affidavit that he could "not ***recall*** consenting to arbitration."  (*See* Defendants' Reply Memorandum of Law in

18-2, ¶ 6 (emphasis added).)  Because the record currently before the Court is sufficient to infer that Plaintiff had at least constructive knowledge of the terms of the Arbitration Policy to assent to the agreement to arbitrate, Plaintiff's second argument is also unavailing.

Third, Plaintiff claims that there is no enforceable arbitration agreement because Defendants have not "provide[d] a conventional standard agreement, which bears the names and the signatures of the parties because it does not exist." (Pl. Opp., Dkt. 18, at 9–10.)  This argument also fails, as courts have repeatedly held that an "electronic 'click' can suffice to signify the acceptance of a contract." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017).

Fourth, Plaintiff claims that Defendants "used the new technology to ensure that the employees would be unlikely to learn of the opt-out agreement or be aware of the existence of an arbitration agreement," since the "arbitration agreements and opt-out provisions were unfairly buried in an agreement." (Pl. Opp., Dkt. 18, at 8–9.)  Once again, this claim is without merit.  As Defendants point out, CVS employees, including Plaintiff, could not have completed the Training Course without viewing the Arbitration Policy, (Bailey Decl., Dkt. 16-2, ¶ 8), and Plaintiff does not contest that he read the Arbitration Policy, (*see* Kassim Affidavit, Dkt. 18-2, ¶ 6).

Finally, to the extent Plaintiff contests the existence and enforceability of the Arbitration Agreement based on Plaintiff's termination in 2016, the Court rejects that argument. (*See* Pl. Opp., Dkt. 18, at 5–8 (arguing that the Arbitration Policy was extinguished when he was terminated from employment with CVS in 2016).)  As discussed *supra*, the Court has concluded that a valid and

---

Further Support of Their Motion to Dismiss, or Alternatively to Stay, and to Compel Arbitration, Dkt. 17, at 10 (quoting Kassim Affidavit, Dkt. 18-2, ¶ 6).)  This material discrepancy between not recalling consenting to arbitration or being unaware of an option to opt out, (Kassim Aff., Dkt. 18-2, ¶ 6), with being unaware of consenting to an arbitration agreement, (Pl. Opp., Dkt. 18, at 10), raises concerns about the care and attention with which Plaintiff's counsel prepared the opposition papers.

enforceable arbitration agreement, *i.e.*, the Arbitration Agreement, existed as of January 4, 2015. There is no evidence that the Arbitration Agreement was ever nullified or terminated.  Thus, it remains a valid and enforceable agreement.  Although Plaintiff argues that the Arbitration Agreement ceased to exist when Plaintiff was terminated for the first time in 2016, as discussed *infra*, the Court finds that Plaintiff's argument is about arbitrability, *i.e.*, whether the Arbitration Agreement covers Plaintiff's 2017–2021 discrimination and retaliation claims, and is one that can be presented to the arbitrator.[5]

In sum, the Court finds that the Arbitration Policy was validly formed.[6]  The inquiry moves onto whether Plaintiff's claims fall within the scope of the Arbitration Agreement.

---

[5] The Court's finding on this issue is based, in part, on the particular facts of this case, including the relatively short gap between Plaintiff's first and second periods of employment at CVS, *i.e.*, two weeks based on Defendants' records or six months based on Plaintiff's complaint, and the fact that the Arbitration Agreement was entered into, and existed separately from, any employment contract Plaintiff had with CVS.

[6] While not framed as a challenge to the validity of the Arbitration Agreement's formation, Plaintiff also questions whether Defendants are even parties to the Arbitration Agreement by pointing out that the agreement is between Plaintiff and "CVS Health (including its subsidiaries)" as the employing party, and charges Defendants with "fail[ing] to produce any documentation substantiating" that Defendants are subsidiaries or affiliates of CVS Health.  (Pl. Opp., Dkt. 18, at 9; *see also* Arbitration Policy, Dkt. 16-2, at ECF 8).  In response, Defendants direct the Court's attention to a hyperlink of CVS Health's public 10-K filing, which they argue removes any doubt that they are subsidiaries of CVS Health.  Although Defendants should have attached the 10-K as an exhibit to their reply brief, the Court can consider and rely on Defendants' parent corporation's 10-K filing to resolve issues of fact.  *See BS Sun Shipping Monrovia v. Citgo Pet. Corp.*, No. 6-CV-839 (HB), 2006 WL 2265041, at *3 n.6 (S.D.N.Y. Aug. 8, 2006) ("While it is generally improper to consider documents not appended to the initial pleading or incorporated in that pleading by reference in the context of a Rule 12(b)(6) motion to dismiss, it is proper (and in fact necessary) to consider such extrinsic evidence when faced with a motion to compel arbitration." (citing *Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26, 32–33 (2d Cir. 2001))).  Accordingly, the Court finds that there is no genuine factual issue as to whether Defendants, as subsidiaries of CVS Health, are parties to the Arbitration Agreement.

### III.   Whether Plaintiff's Claims Fall within the Scope of the Arbitration Agreement is an Issue of Arbitrability that Must be Decided by an Arbitrator

At the core of the parties' dispute on whether this case should be arbitrated is the question of whether Plaintiff's discrimination and retaliation claims arising from his second period of employment with Defendants fall within the scope of the Arbitration Agreement that the parties entered into before he was terminated and re-hired.  In their motion papers, Defendants raise a gateway arbitrability issue, namely that "[b]ecause the parties have a contract requiring arbitration of plaintiff's employment-related claims, all remaining questions of arbitrability in this case have been delegated to an arbitrator and may not be decided by this Court."  (Def. Mem., Dkt. 16-1, at 12.)  Defendants assert that the language of the Arbitration Policy that Plaintiff agreed to be bound by as part of the Arbitration Agreement is "clear and unmistakable" in delegating issues of arbitrability to the arbitrator.  (*See id.*)

Plaintiff entirely fails to address Defendants' argument that the question of whether this dispute falls within the scope of the Arbitration Agreement must be addressed by the arbitrator, (*see generally* Pl. Opp., Dkt. 18), and he thereby has waived any contrary argument, *see Cole v. Blackwell Fuller Music Publ'g, LLC*, No. 16-CV-7014 (VSB), 2018 WL 4680989, at *7 (S.D.N.Y. Sept. 28, 2018) ("Numerous courts have held that a plaintiff's failure to address an issue raised by its adversary amounts to a concession or waiver of the argument." (collecting cases)).  Plaintiff's failure to address the argument is critical because he, as the "party to an arbitration agreement seeking to avoid arbitration . . . bears the burden of showing the agreement to be inapplicable or invalid."  *Harrington v. Atl. Sounding Co.*, 602 F.3d 113, 124 (2d Cir. 2010).

Putting aside Plaintiff's waiver, the Court concludes that the parties' clear and unmistakable agreement to arbitrate issues of arbitrability requires the arbitrator to determine

whether the employment discrimination claims from the second term of employment are within the scope of the Arbitration Agreement.

### A.      The Applicability of the Arbitration Agreement After Termination and Re-hire is a Question of Arbitrability

Parties to a contract can agree to arbitrate gateway questions of arbitrability, which are "(1) whether there exists a valid agreement to arbitrate at all under the contract in question . . . and if so, (2) whether the particular dispute sought to be arbitrated falls within the scope of the arbitration agreement." *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Belco Pet. Corp.*, 88 F.3d 129, 135 (2d Cir. 1996). In cases where the question is whether or not an arbitration agreement can be applied against someone who may not have ever agreed to it, that is generally an arbitrability question for a court. *Id.* (citations omitted). However, "when the parties have a contract that provides for arbitration of some issues," as is the case here, the controlling question for the court is "whether a particular merit-related dispute is arbitrable because it is within the scope of a valid arbitration agreement." *Id.* (quotations omitted). "In that context, the law reverses the presumption and any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Id.*

As discussed *supra*, here, the parties mutually agreed to a valid arbitration agreement in January 2015. (Bailey Decl., Dkt. 16-2, ¶ 16.) Therefore, Defendants' motion to compel arbitration will turn on whether the claims raised by Plaintiff fall within the scope of the Arbitration Policy that Plaintiff agreed to be bound by in the Arbitration Agreement.

### B.      The Arbitration Policy Evinced a Clear and Unmistakable Agreement to Arbitrate Arbitrability

New York law acknowledges the "well settled proposition that the question of arbitrability is an issue generally for judicial determination," but at the same time recognizes an "important legal and practical exception" when parties "evince[ ] a 'clear and unmistakable' agreement to

arbitrate arbitrability." *Smith Barney Shearson Inc. v. Sacharow*, 91 N.Y.2d 39, 45–46 (N.Y. 1997). Courts have recognized the inclusion of a "delegation clause" that specifically states that the arbitrator will decide questions about validity and scope of the arbitration clause as a clear and umistakable intent of the parties to arbitrate arbitrability issues. *See Kai Peng*, 237 F. Supp. 3d at 53 (collecting cases).

Another way in which parties can express clear and umistakable intent to delegate arbitrability to the arbitrators is to incorporate procedural rules that authorize the arbitrator to decide arbitrability. *See DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 318 (2d Cir. 2021) ("Where the parties explicitly incorporate procedural rules that empower an arbitrator to decide issues of arbitrability, that incorporation may serve as clear and unmistakable evidence of the parties' intent to delegate arbitrability to an arbitrator." (internal quotation marks omitted)). The AAA rules have explicitly empowered arbitrators to decide issues of arbitrability through AAA Employment Arbitration Rules and Mediation Procedures ("AAA Rules") Rule 6(a), which states with respect to jurisdiction that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." *See* AAA Employment Arbitration Rules and Mediation Procedures Rule 6(a) (Nov. 1, 2009). In fact, New York courts have frequently examined AAA procedural rules and determined that incorporation of these rules in an arbitration agreement reflect the parties' intent to "leave the question of arbitrability to arbitrators." *See Life Receivables Trust v. Goshawk Syndicate 102 at Lloyd's*, 888 N.Y.S.2d 458, 495–96 (N.Y. App. Div. 2009);[7] *see also Zachariou*

---

[7] In *Life Receivables Trust*, the First Department of New York State's Supreme Court Appellate Division examined AAA rules that read in relevant part, "the tribunal shall have the power to rule on its own jurisdiction, including objections with respect to the existence, scope or validity of the arbitration agreement." 888 N.Y.S.2d at 496. Meanwhile, Rule 6(a), which is incorporated into the Arbitration Policy states that that "[t]he arbitrator shall have the power to

*v. Manios*, 891 N.Y.S.2d 54, 56 (N.Y. App. Div. 2009) (explaining that delegating the question of arbitrability to the arbitrator is appropriate "[w]here there is a broad arbitration clause and the parties' agreement specifically incorporates by reference the AAA rules providing that the arbitration panel shall have the power to rule on its own jurisdiction").

Courts have warned, however, that "context matters" and "[i]ncorporation of such rules into an arbitration agreement does not, *per se*, demonstrate clear and unmistakable evidence of the parties' intent to delegate threshold questions of arbitrability to the arbitrator where other aspects of the contract create ambiguity as to the parties' intent." *DDK Hotels*, 6 F.4th at 318.  Courts have found that even when the parties have incorporated procedural rules that would empower an arbitrator to decide issues of arbitrability, the "requisite clear and unmistakable inference of intent to arbitrate arbitrability" is lacking where "the arbitration agreement is narrow[], vague, or contains exclusionary language suggesting that the parties consented to arbitrate only a limited subset of disputes." *Id.* at 319.

For example, in *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, the parties agreed to the following broadly worded arbitration clause, with a qualifying provision: "*Except as may be provided in the NASDAQ OMX Requirements*, all claims, disputes, controversies and other matters in question between the Parties to this Agreement . . .  shall be settled by final and binding arbitration."  770 F.3d 1010, 1016 (2d Cir. 2014) (emphasis added).  Because "one of the provisions of the NASDAQ OMX Requirements at least arguably" covered the dispute in that case, the Second Circuit concluded that there was some "ambiguity as to the parties' intent to have the question of arbitrability—which would include whether a dispute falls within or outside the

---

rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."  While the two sets of AAA rules are not identical, it is apparent that the differences in the respective rules are negligible.

scope of the qualifier—decided by an arbitrator." *Id.* at 1031–32.  The Second Circuit therefore

held that in such cases where a qualifying provision of an arbitration clause "arguably covers" the

dispute between the parties, courts should not find that the parties "clearly and unmistakably

committed questions of arbitrability to an arbitrator rather than the court." *Id.*

Here, the Arbitration Policy expressly incorporates the AAA Rules in the "Rules and

Procedures" section.  (*See* Arbitration Policy, Dkt. 16-2, at ECF 10.)  Therefore, this Court must

determine whether the Arbitration Policy is "narrow[], vague, or contains exclusionary language

suggesting that the parties consented to arbitrate only a limited subset of disputes," rather than "all

aspects of all disputes." *DDK Hotels, LLC*, 6 F.4th at 319.  By the Arbitration Policy's own terms,

the "Claims Covered by [the] Policy" are:

> **2. Claims Covered by this Policy.** Except as otherwise stated in this Policy, any
> and all legal claims, disputes or controversies that [Defendants] may have, now or
> in the future, against an Employee or that an Employee may have, now or in the
> future, against [Defendants], or one of its employees or agents, arising out of or
> related to the Employee's employment with CVS Health or the termination of the
> Employee's employment.

(*See* Arbitration Policy, Dkt. 16-2, ECF  8.)  The Court does not find this language to be either

vague or narrow, so as to suggest that the parties intended to consent to arbitrate only a limited

subset of disputes.  Further, unlike in *NASDAQ OMX Group*, despite the phrase "[e]xcept as

otherwise stated in this Policy" in Subsection 2, there is no qualifying provision in the Arbitration

Policy that supports a reasonable inference that the parties "consented to arbitrate only a limited

subset of disputes." *DDK Hotels*, 6 F.4th at 319.

The Court specifically has considered whether Subsection 3 of the Arbitration Policy,

labeled "**Claims NOT Covered by this Policy**", supports such an inference.  Subsection 3

explains that the following categories are not covered by the Arbitration Policy: "claims by an

Employee for workers compensation, state disability insurance, unemployment insurance benefits

or claims for benefits under an employee benefit plan." (Arbitration Policy, Dkt. 16-2, ECF 9.) Subsection 3 also notes that resolution of internal disputes, non-legal claims, or litigation pending at the time the relevant parties agreed to the Arbitration Policy, are not covered by the Arbitration Policy. (*Id.*)

The Court finds that Subsection 3 does not undermine the otherwise broadly worded Arbitration Policy and, in particular, Subsection 2, such that the Court should conclude that the parties did not have a clear and unmistakable intent to arbitrate issues of arbitrability. Subsection 3 carves out from the scope of the Arbitration Policy any workplace disputes that may not rise to the level of litigation (*e.g.*, "internal disputes" and "non-legal claims"), pending litigation (reflecting the fact that the Arbitration Agreement should not have retroactive effect), and legal disputes such as claims regarding workers compensation, unemployment insurance, and state disability (for which there may already be a preexisting and well-established regulatory dispute resolution process). These carved-out categories are neither vague, nor do they significantly narrow the scope of the Arbitration Policy; instead, they delineate a rather broad universe of claims that should be arbitrated. Furthermore, unlike in *NASDAQ OMX Grp.*, none of these categories in Subsection 3 "arguably covers" Plaintiff's employment discrimination claims on the basis of race. *See* 770 F.3d at 1031. Accordingly, the language of this section does not suggest that the parties consented to arbitrate only a limited subset of disputes," rather than "all aspects of all disputes." *See DDK Hotels*, 6 F.4th at 319.

Thus, the Court holds that the broadly worded Arbitration Policy and the incorporation of Rule 6(a) of the AAA Rules demonstrates the parties' clear and unmistakable intent to delegate arbitrability issues to the arbitrator. Since the parties' dispute about whether Plaintiff's claims fall

within the scope of the Arbitration Policy is an arbitrability issue, that question must be decided by the arbitrator.

### C.   Plaintiff's Arguments on Scope of the Arbitration Agreement Must Be Addressed by the Arbitrator

Finally, Plaintiff contests whether his claims during his employment as an Operations Manager from 2017 to February 2021 fall within the scope of the Arbitration Agreement, primarily by arguing that the Arbitration Agreement was extinguished when he was terminated from employment with CVS in 2016. (*See* Pl. Opp., Dkt. 18, at 5–8.)[8] However, that argument goes to the scope of the Arbitration Agreement that Plaintiff entered into on January 4, 2015, which is a "gateway question[] of arbitrability," that should be presented to an arbitrator, given the parties' "clear and unmistakable" intent to arbitrate arbitrability issues. *Kai Peng*, 237 F. Supp. 3d at 52.

## CONCLUSION

For the reasons stated above, the Court grants Defendants' motion to compel arbitration. Furthermore, the Court stays this matter pending the conclusion of arbitration. *See Katz v. Cellco P'ship*, 794 F.3d 341, 343 (2d Cir. 2015) (holding that the FAA "requires a stay of proceedings when all claims are referred to arbitration and a stay [is] requested").

SO ORDERED.

/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated: September 20, 2022
      Brooklyn, New York

---

[8] As discussed *supra*, to the extent this argument actually is about whether an arbitration agreement existed after Plaintiff's termination in 2016, the Court has considered and rejected that argument.